IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:20-CV-95-D

SECURITIES AND EXCHANGE )
COMMISSION, )
 )
 Plaintiff, )
 )
 v. ) **ORDER**
 )
STACEY L. BEANE, and )
TRAVIS LASKA, )
 )
 Defendants. )

On May 20, 2020, the Securities and Exchange Commission ("plaintiff" or "SEC" or "Commission") moved for summary judgment and requested a civil penalty against defendants Stacey L. Beane ("Beane") and Travis Laska ("Laska") (collectively, "defendants") [D.E. 12]. On June 9, 2020, defendants agreed that the court should grant the SEC's motion for summary judgment, but requested a just civil penalty that balances their wrongdoing with their extensive cooperation in the investigation and prosecution of their former supervisor Stephen Peters ("Peters"), their acceptance of responsibility, their lack of financial gain from their wrongdoing or Peters's wrongdoing, and their current financial circumstances. See [D.E. 17]. On June 12, 2020, the SEC replied and noted that a civil penalty is needed to punish defendants and to deter others. See [D.E. 18]. On June 16, 2020, defendants filed a supplemental response. See [D.E. 19]. As explained below, the court grants the SEC's motion for summary judgment and imposes civil penalties of $7,500 against Beane and $7,500 against Laska.

I.

The court presided at Peters's criminal trial in May and June 2019. The jury convicted Peters of 20 counts: investment advisor fraud and aiding and abetting (count one), fraud in the

sale of unregistered securities (count two), wire fraud and aiding and abetting (counts three through eleven), money laundering and aiding and abetting (counts twelve through fifteen), conspiracy to make and use false documents and to falsify and conceal records (count sixteen), make and use false documents and aiding and abetting (count seventeen), falsifying and concealing records and aiding and abetting (count eighteen), corrupt endeavor to influence federal agency (count nineteen), and aggravated identity theft and aiding and abetting (count twenty). See Verdict, United States v. Stephen Condon Peters, No. 5:17-CR-411-D [D.E. 99] (E.D.N.C. 2019). Peters committed these crimes while an investment advisor who owned and operated Vision Quest Capital, LLC ("VQ Capital"), Vision Quest Wealth Management, LLC ("VQ Management"), and VQ Wealth, LLC ("VQ Wealth"; collectively, the "VQ Entities"). Beane and Laska worked for Peters at VQ Management and testified at the trial concerning Peters's wrongdoing and their own wrongdoing. See SEC v. Beane & Laska, No. 5:20-CV-95-D [D.E. 12-6, 12-7] (E.D.N.C. 2020). On September 13, 2019, the court sentenced Peters to a total of 480 months' imprisonment. See Peters, No. 5:17-CR-411[D.E. 157].

On May 1, 2020, this court permanently enjoined Beane and Laska from violating Section 204(a) of the Investment Advisers Act of 1940 [15 U.S.C. § 80b-4(a)] ("Advisers Act") and Rule 204-2 thereunder [17 C.F.R. § 275.204-2] by knowingly or recklessly providing substantial assistance to an investment adviser registered with the Commission under Section 203 of the Advisers Act [15 U.S.C. § 80b-3] to fail to make and keep true, accurate, and current books and records, or to furnish copies thereof to representatives of the Commission. See Beane & Laska, No. 5:20-CV-95-D [D.E. 9]; [D.E. 10]; [D.E. 12-1] ¶¶ 1–4. The court also held that Beane and Laska "shall pay a civil penalty pursuant to Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)]. The Court shall determine the amount of the civil penalty upon motion of the Commission." [D.E. 12-1] ¶¶ 3–4.

2

In its order of May 1, 2020, the court noted that "in connection with the Commission's motion for a civil penalty, and at any hearing held on such a motion: (a) [Beane and Laska] will be precluded from arguing that he (or she) did not violate the federal securities laws as alleged in the Complaint; (b) [Beane and Laska] may not challenge the validity of the Consent or this Order of Permanent Injunction; (c) solely for the purposes of such motion, the allegations of the Complaint shall be accepted as and deemed true by the Court; and (d) the Court may determine the issues raised in the motion on the basis of affidavits, declarations, excerpts of sworn deposition or investigative testimony, and documentary evidence, without regard to the standards for summary judgment contained in Rule 56(c) of the Federal Rules of Civil Procedure." Id. (alterations and quotation omitted).

The court accepts as true the allegations of the SEC's complaint for purposes of the SEC's motion for summary judgment. The court also has considered the entire record, including the sworn testimony of Beane and Laska in Peters's criminal trial.

The Commission filed this civil action against Beane and Laska for violating the federal securities laws which require an investment adviser registered with the Commission to maintain true and accurate books and records. Beane and Laska assisted Peters in his efforts to hide from the Commission a Ponzi scheme that Peters perpetrated through VQ Management (an investment adviser in Raleigh, North Carolina that was registered with the Commission), VQ Capital, and VQ Wealth. See id. ¶ 5.

Between at least April 2012 and June 30, 2017, Peters, acting individually or through VQ Capital or VQ Management, fraudulently offered and sold approximately $10.1 million in promissory notes that VQ Capital issued (the "VQ Capital notes" or "notes") to at least 60 investors, most of whom were elderly clients of VQ Management. See id. ¶ 6. As part of his fraud, Peters told numerous investors that VQ Capital would invest the offering proceeds into revenue-producing businesses and that neither he nor VQ Management would receive any

3

compensation for their investment in the VQ Capital notes. In truth, Peters diverted at least two-thirds of the money raised for his own benefit or to pay interest to, or redeem, earlier investors. See id. ¶ 7.

During a 2016 examination and an ensuing enforcement investigation, Beane and Laska falsified multiple VQ Management records to conceal the fraud and other misconduct from the Commission staff. See id. ¶ 8. For example, in response to document requests of the Commission's examination staff, and at Peters's direction, Beane and Laska altered investor accreditation documents and client balance sheets to make several unaccredited investors appear to be accredited. See id. ¶ 9. The alterations also made it appear as if the employees had disclosed to VQ Management's chief compliance officer the potential conflict of interest resulting from the sale of VQ Capital notes to VQ Management's advisory clients. See id. ¶ 10.

Beane and Laska aided and abetted VQ Management's violations of the books and records requirements under Section 204 of the Advisers Act [15 U.S.C. § 80b-4] and Rule 204-2(a) thereunder [17 C.F.R. § 275.204-2(a)], which require that advisers registered with the Commission "make and keep true, accurate and current" books and records prescribed by the Commission relating to the advisers' investment advisory business and "furnish such copies" of those records as the Commission requires. Id. ¶ 11.

Stacey L. Beane, age 35, resides in Winter Park, Florida. See id. ¶ 13. Beane has an accounting degree and worked as a bookkeeper for one or more of the VQ Entities from 2011 until May 2017. See id. Beane holds no securities licenses. See id.

Travis Laska, age 26, resides in Raleigh, North Carolina. See id. ¶ 14. Laska worked as an intern at VQ Management in the summer of 2015. See id. Laska graduated from Johns Hopkins University with a political science degree in 2017. See id. Laska worked for VQ Management in 2016 and 2017 as an "operations associate" and later as an "M&A associate."

4

Id. Laska left VQ Management in May 2017 and got another job. See id. Laska holds a Series 65 license. See id.

Stephen C. Peters, age 47, controlled the VQ Entities. See id. ¶ 15. At all relevant times, Peters was an investment adviser representative of VQ Management and held Series 7, 63, and 65 licenses. See id. Before forming VQ Management in 2005, Peters was associated with another registered broker-dealer from August 2000 through November 2004. See id. Peters is currently incarcerated in Petersburg, Virginia. See id.

In 2005, Peters formed VQ Management, a Raleigh-based, North Carolina limited liability company. See id. ¶ 16. Beginning in March 2016, VQ Management was registered with the Commission as an investment adviser. See id. VQ Management terminated that registration in December 2017 by filing a Form ADV-W. See id. Before March 2016, VQ Management was registered as an investment adviser with the State of North Carolina and several other states. See id. The VQ Entities effectively ceased operations following the FBI's July 12, 2017 search and seizure of their business records and offices. See id.

VQ Capital was a Raleigh-based, North Carolina limited liability company that Peters formed in 2008 purportedly to (i) make investments in income-producing businesses and real estate, and (ii) provide financial consulting services to business owners. See id. ¶ 17. Although VQ Capital sold the promissory notes at issue from at least July 2010, it did not file a Form D in connection with its offering until October 5, 2016, when Commission examination staff noted the absence of such a filing. See id. VQ Capital's Form D stated that VQ Capital had begun the offering on July 8, 2010, and had sold $11,245,501 in notes through October 5, 2016. See id. VQ Capital is not registered with the Commission in any capacity. See id.

VQ Wealth was a Raleigh-based, North Carolina limited liability company that Peters formed in 2008. See id. ¶ 18. According to filings made with the North Carolina Department of Secretary of State and Peters's investigative testimony, VQ Wealth was the sole member of VQ

5

Management and VQ Capital. See id. Peters and his spouse, Amy Peters, owned a majority interest in VQ Wealth. See id. VQ Wealth never registered with the Commission in any capacity. See id.

Between at least April 2012 and June 30, 2017 (the "Relevant Period"), Peters, acting individually or through VQ Capital or VQ Management, offered and sold approximately $10.1 million in promissory notes to at least 60 investors, the majority of whom were advisory clients of VQ Management. See id. ¶ 19. Many were elderly and unsophisticated. See id. VQ Capital issued the notes which typically had five-year terms, and purported to pay annual interest of eight percent if paid quarterly, or nine percent if the noteholder elected to receive a lump-sum payment of principal and interest at the end of the term. See id.

Although Peters varied what he told prospective investors to convince them to invest in VQ Capital notes, he repeated certain common claims to many note purchasers. See id. ¶ 20. For example, Peters told numerous investors that VQ Capital would invest the offering proceeds in revenue-producing businesses, and that he and VQ Capital would be paid from the spread between the greater return that VQ Capital would earn on the investments and the lesser return that VQ Capital was obligated to pay the noteholders. See id. ¶ 21. Similarly, Peters represented to some prospective investors that neither he nor the VQ Entities would receive compensation from the note offering proceeds. See id. ¶ 22. To the majority of investors, Peters represented that the VQ Capital notes presented little or no risk of loss. See id. ¶ 23. Peters also told some investors that the notes were "guaranteed." See id. Peters's representations were false. See id. ¶ 24.

Although Peters used some investor proceeds on what could be construed generously as business activities, he diverted at least two-thirds of the money for his own benefit or to pay interest to, or redeem, earlier investors. See id. ¶ 25. During the Relevant Period, Peters spent at least $4.4 million to support an opulent lifestyle, including purchasing and remodeling a large

6

horse farm in North Carolina, purchasing items for his horse farm, and building and furnishing a large vacation home in Costa Rica. See id. ¶ 26.

As part of Peters's scheme, Peters routed the fraudulently obtained funds from VQ Capital through VQ Wealth and then to his own use. Peters spent at least another $4.9 million making interest and principal payments to earlier investors. See id. ¶ 27. Peters never disclosed to note purchasers that he would pay a substantial percentage of the note proceeds to himself or that he would use investor proceeds for interest payments or redemptions. See id. ¶ 28. Peters also failed to disclose to note purchasers that of the approximately one-third of the funds spent on business activities, Peters used much to pay the ongoing operating expenses of his existing businesses, rather than to invest in new businesses. See id. ¶ 29. Moreover, the notes were not guaranteed and presented substantial risk. See id. ¶ 30.

In September 2016, the Commission staff began an examination of VQ Management. See id. ¶ 31. In February 2017, the Commission enforcement staff began an investigation into VQ Management. See id. As part of the examination and investigation, the Commission staff requested various documents relating to the offer and sale of VQ Capital notes to VQ Management advisory clients. See id. ¶ 32.

In sworn testimony during Peters's criminal trial, Beane and Laska admitted that, at Peters's direction, they falsified various VQ Management documents that were requested by, and provided to, Commission staff. See id. ¶ 33. For example, the examination staff requested documents concerning the outside business activities of VQ Management employees, including Peters. See id. ¶ 34. In response, Beane created false outside business activity disclosures to make it appear as though Peters and other VQ Management personnel had disclosed to VQ Management's compliance officer the potential conflict of interest relating to the sale of VQ Capital notes to VQ Management's advisory clients. See id. ¶ 35. At Peters's direction, Beane then backdated these forms to a period preceding the Commission's examination and forged the

7

compliance officer's signature on those documents. See id. ¶ 36. This fraudulent conduct made it appear as though the employees had signed the acknowledgments as of the date they were hired. See id. ¶ 37. VQ Management eventually provided these fraudulent documents to the Commission examination staff. See id.

At Peters's direction, Laska and Beane also forged advisory client signatures to investor policy statements that purported to document, among other things, the risk tolerance and investment objectives of certain VQ Management advisory clients that invested in the VQ Capital notes. See id. ¶ 38. Moreover, at Peters's direction, Beane and Laska fabricated investor accreditation questionnaires and altered client balance sheets to make several VQ Capital note investors appear to be accredited when they were not. See id. ¶ 39. At Peters's direction, Beane and Laska also inflated the assets on the balance sheets of certain investors to make it appear as though they had net worth in excess of $1 million. See id. ¶ 40. VQ Management provided these documents to Commission examination or enforcement staff. See id. At Peters's direction, Beane also backdated subscription agreements concerning the sale of VQ Capital notes to certain VQ Management advisory clients. See id. ¶ 41. This fraudulent conduct made it appear as though the investors executed the agreements when they purchased the notes. See id. ¶ 42. In fact, Beane created these agreements only after the enforcement staff requested them. See id.

At Peters's direction, Beane falsified VQ Management's financial records to conceal client lawsuits by changing "settlements" after various amounts on the balance sheet and income statement to the more innocuous "professional fees attorneys." Id. ¶ 43. VQ Management provided the altered financial statements to Commission examination staff. See id. Beane and Laska also assisted Peters in hiding certain documents from the Commission staff. See id. ¶ 44. For example, in response to examination staff requests for all emails by Peters and other VQ Management employees during a particular date range, Beane and Laska used certain keyword searches to identify responsive emails and withhold them from the production. See id. ¶ 45. The

8

withheld emails included those concerning the marketing of VQ Capital notes, compensation paid in connection with the sale of those notes, and several client lawsuits against VQ Management. See id. ¶ 46.

At Peters's direction, Laska manipulated the firm's client relationship database to hide any entries reflecting the marketing and sale of VQ Capital notes to VQ Management clients. See id. ¶ 47. Laska then provided the examination staff, through Peters, with reports from that database that did not show the hidden entries. See id. At Peters's direction, Laska also hid from the Commission examination staff entries in that database showing that VQ Management had access to several client bank account numbers and login passwords, thereby obscuring that the firm had custody of those assets. See id. ¶ 48.

Many of the documents that Beane and Laska falsified were records that VQ Management had to keep and maintain pursuant to the Advisers Act and the rules promulgated thereunder. See id. ¶ 49. During Peters's criminal trial, Beane and Laska each testified under oath and admitted to, among other things, their respective misconduct as outlined in the complaint and in the accompanying statement of material facts. See id. ¶ 50. Beane and Laska admitted that each knew his or her conduct was wrong. See id. ¶ 33.

In fashioning the civil penalty, the court has considered the need to punish Beane and Laska and deter others from engaging in similar misconduct. In mitigation, Peters was an extremely abusive supervisor and directed his wrath at both Beane and Laska. See [D.E. 19-1] ¶ 2; [D.E. 19-2] ¶ 2. Neither gained financially from their own wrongdoing or Peters's wrongdoing (except for their relatively insignificant salaries). See [D.E. 19-1] ¶ 4; [D.E. 19-2] ¶ 4. Beane and Laska ultimately went to the Federal Bureau of Investigation ("FBI") and revealed Peters's wrongdoing. See [D.E. 19-1] ¶ 5; [D.E. 19-2] ¶ 5. The FBI did not immediately reveal the wrongdoing to the SEC. See [D.E. 19-1] ¶ 6; [D.E. 19-2] ¶ 6. Beane and Laska then cooperated against Peters, and their assistance helped the FBI gather information to obtain the

9

July 2017 search warrant. Their disclosures (along with the disclosures of other internal whistleblowers) led to the execution of the July 2017 search warrant that effectively ended Peters's operation of the VQ Entities. Beane and Laska continued to cooperate extensively with law enforcement both before and after Peters's indictment. Each also testified very credibly at Peters's trial and played an important role in Peters's conviction.

After leaving VQ Management, Beane moved to Orlando, Florida due to her fear of Peters. See [D.E. 19-1] ¶ 8. Beane was unemployed for several months. Beane ultimately found a job in 2017. When the SEC filed this civil action in May 2020, Beane lost her job. See id. ¶ 10. Beane lacks any assets with which to pay a sizeable penalty, drives a 15-year-old car, has student loan debt of $10,000, and has $8,000 in savings. See id. ¶ 11.

As for Laska, he left VQ Management in May 2017. See [D.E. 12-1] ¶ 14. He then became employed in the securities industry in Raleigh. In 2019, his annual salary was $65,000. In May 2020, after the SEC filed this action, Laska's firm terminated his employment. Laska has bank accounts and an IRA that total less than $5,000, drives a 10-year-old car worth $5,000, has $130,000 in student loan debt, and has $8,000 in credit card debt. See [D.E. 19-2] ¶ 11.

Beane and Laska's extensive and critical whistleblowing and cooperation are significant mitigating factors. Likewise, the court has considered their current financial circumstances and capacity to earn money. The court also has considered the need to punish them and to deter others. Having considered the entire record, the court imposes a civil penalty of $7,500 on Beane and $7,500 on Laska.

II.

The court GRANTS the SEC's motion for summary judgment [D.E. 12]. Defendant Beane shall pay a civil penalty of $7,500 pursuant to section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)]. Defendant Beane shall make this payment within 60 days after entry of this Final Judgment. Defendant Beane may transmit payment electronically to the Commission,

10

which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm. Defendant Beane may also pay by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to:

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; Stacy L. Beane as a defendant in this action; and specifying that payment is made pursuant to this final judgment.

Beane shall simultaneously transmit photocopies of evidence of payment and case-identifying information to the Commission's counsel in this action, Edward G. Sullivan, Esq., Securities and Exchange Commission, 950 East Paces Ferry Road, NE, Suite 900, Atlanta, GA 30326. By making this payment, defendant Beane relinquishes all legal and equitable right, title, and interest in such funds and no part of the funds shall be returned to defendant Beane. The Commission shall send the funds paid pursuant to this final judgment to the United States Treasury. Defendant Beane shall pay post-judgment interest on any delinquent amounts pursuant to 28 U.S.C. § 1961.

Defendant Laska shall pay a civil penalty of $7,500 pursuant to section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)]. Defendant Laska shall make this payment within 60 days after entry of this final judgment. Defendant Laska may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm. Defendant Laska may also pay by certified check,

11

bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to:

>   Enterprise Services Center
>   Accounts Receivable Branch
>   6500 South MacArthur Boulevard
>   Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; Travis Laska as a defendant in this action; and specifying that payment is made pursuant to this Final Judgment.

Defendant Laska shall simultaneously transmit photocopies of evidence of payment and case-identifying information to the Commission's counsel in this action, Edward G. Sullivan, Esq., Securities and Exchange Commission, 950 East Paces Ferry Road, NE, Suite 900, Atlanta, GA 30326. By making this payment, defendant Laska relinquishes all legal and equitable right, title, and interest in such funds and no part of the funds shall be returned to defendant. The Commission shall send the funds paid pursuant to this final judgment to the United States Treasury. Defendant Laska shall pay post-judgment interest on any delinquent amounts pursuant to 28 U.S.C. § 1961.

IT IS FURTHER ORDERED that, the terms of the final judgment include the directives in this order, and include the terms of the Order of Permanent Injunction and Other Relief As to Defendant Stacey L. Beane and Order of Permanent Injunction and Other Relief As to Defendant Travis Laska, both orders signed by this court on May 1, 2020. The Clerk of Court shall enter final judgment against defendants Beane and Laska. This court shall retain jurisdiction of this matter in order to enforce the terms of this final judgment

SO ORDERED. This 19 day of January 2021.

                                              JAMES C. DEVER III
                                              United States District Judge